Filed 3/14/16  Plesnik v. Those Certain Underwriters at Lloyd's London CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| PALO PLESNIK,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>THOSE CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, et.al.,<br><br>      Defendants and Respondents. | B262790<br><br>(Los Angeles County<br>Super. Ct. No. BC473548) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Reversed.

Law Offices of Kyle Kubisch, Kyle Kubisch; Law Office of Eric N. Riezman, Eric N. Riezman, for Plaintiff and Appellant.

Vanderford & Ruiz, Ty S. Vanderford, for Defendants and Respondents.

Plaintiff and appellant Palo Plesnik lent money to borrower Armen Melkonians (borrower) and the loans were secured by deeds of trust on borrower's property on Roscomare Road in Los Angeles (the Property). Borrower defaulted on the loan, and plaintiff initiated foreclosure proceedings. Plaintiff bought the Property at the foreclosure auction and discovered after the sale that the Property had been damaged. Plaintiff reported the damage and claimed he was entitled to compensation from defendants and respondents Those Certain Underwriters at Lloyd's London (Lloyds) and The Harry W. Gorst Company (Gorst), who had earlier issued a homeowner's policy for the Property that named plaintiff as a person entitled to insurance proceeds in the event of a covered loss (a "loss payee"). Defendants denied plaintiff's insurance claim, and plaintiff responded by filing this action. The trial court granted summary judgment for defendants because it concluded a mutual release executed by plaintiff and borrower to settle a separate lawsuit extinguished plaintiff's interest in the Property and thus his right to collect insurance proceeds. We consider whether the trial court correctly granted defendants' summary judgment motion for that reason.

## BACKGROUND

The facts necessary to decide this appeal are not disputed.[1] Plaintiff is a private real estate mortgage lender who made two loans to borrower, one for $1.6 million and another for $450,000, secured by two deeds of trust on the Property. The deeds of trust required borrower to obtain hazard insurance on the Property that designated plaintiff as a

---

[1] We recognize there are many facts that are in dispute and that were not resolved by the grant of summary judgment. There are disagreements concerning the representations made to obtain insurance coverage, the legal status of the parties involved in that process, and even the existence and extent of coverage. We do not discuss or consider those facts in deciding whether the trial court erred in granting summary judgment. For purposes of this appeal, we assume the Property was covered by insurance issued by Lloyds and plaintiff was a loss-payee on the policy.

2

loss payee. Gorst bound a homeowner's insurance policy issued by Lloyds that so designated plaintiff in April 2010.

In the meantime, borrower defaulted on his obligation to make loan payments and plaintiff commenced non-judicial foreclosure proceedings on the Property by recording notices of default. Borrower then filed a lawsuit against plaintiff in Los Angeles County Superior Court seeking an injunction to halt the foreclosure proceedings (the Foreclosure Lawsuit). The court denied borrower's request to preliminarily enjoin the foreclosure proceedings, and plaintiff purchased the Property at a foreclosure auction on May 19, 2010, where he was the high bidder via a credit bid (whereby a lender bids not in cash but in an amount credited against the borrower's existing indebtedness).

Plaintiff inspected the Property after he took possession and discovered it had been stripped of certain items; borrower admitted that he removed appliances from the property prior to the foreclosure sale. Plaintiff reported the loss and claimed he was entitled to compensation from defendant Lloyds under the homeowner's policy naming borrower as the insured and plaintiff as an "additional interest," mortgagee, and loss payee. Lloyds denied the insurance claim, asserting among other things that the policy application contained material misrepresentations, and notified plaintiff that it was rescinding the policy.

In August 2011—over a year after the foreclosure sale and plaintiff's discovery of the loss, and over seven months after Lloyds denied plaintiff's insurance claim—plaintiff and borrower agreed to settle the Foreclosure Lawsuit that was still then pending. There is little additional information about that lawsuit in the record before us. The record on appeal does not include a copy of the complaint borrower filed to commence the action, but plaintiff describes it as including a usury claim. There is no information in the record related to settlement negotiations.

3

The record does include, however, a copy of the agreement plaintiff and borrower executed to settle the Foreclosure Lawsuit.[2] The agreement states the parties' desire "to settle and compromise their differences in the [Foreclosure Lawsuit] and to give assurances that any and all claims made in the [lawsuit] will not be further prosecuted." In the paragraph of the agreement labeled "Consideration," plaintiff agreed to pay $15,000 to borrower and each man agreed to bear his own costs and attorneys' fees. In the next paragraph of the agreement—the provision upon which the disposition of this appeal turns—the parties agreed as follows:

> **Release**. In consideration of the above-referenced payment and mutual promises and releases contained herein and except with respect to the obligations set forth herein, [plaintiff] on the one hand and [borrower] on the other *hereby release and discharge each other of and from any and all* manner of action or actions, cause or causes of action, in law or in equity, suits, *debts*, contracts, agreements, promises, liability, claims, demands, damages, loss, cost or expense, of any nature whatsoever, known or unknown, fixed or contingent, which the parties now have or may hereafter have against one another based upon or relating to any of the matters, facts, or things alleged or set forth in the pleadings on file in the Action, and based upon or relating to any other matter, fact, circumstance, action,

---

[2] The settlement agreement refers to a cross-action but does not provide any further details about the cross-claim(s). Defendants argue that plaintiff filed a cross-complaint against borrower alleging fraud, waste, and construction defects, and that the allegations of the cross-complaint include alleged property damages for which plaintiff also submitted the insurance claims at issue in this lawsuit. Defendants provide no citation to the record in their brief on appeal to support this assertion. At oral argument, counsel for defendants identified a select few questions and answers in excerpts of plaintiff's deposition that concern certain allegations apparently made in the cross-complaint plaintiff filed against borrower, but the document itself is not included in the record and the few deposition references shed little light on the matter.

4

agreement or occurrence which arose from the beginning of time to the date

of this Agreement.  (Italics added.)

After settling the Foreclosure Lawsuit, plaintiff in November 2011 filed this action against Lloyds, Gorst (Lloyd's agent for purposes of doing business in the United States), and named defendants MJV Insurance Brokers and its owner Vakili Jalilaldien.  One or more of these defendants brought a series of unsuccessful motions for summary judgment or adjudication between December 2012 and May 2014.

Lloyds and Gorst filed another motion for summary judgment in July 2014 contending the release plaintiff executed in connection with the Foreclosure Lawsuit operated as a complete defense to all of plaintiff's causes of action.  Specifically, defendants argued the "insurable interest" doctrine only permits a party to collect insurance proceeds if he or she has an interest in the insured asset, and plaintiff no longer had such an interest in the Property because it had been extinguished by the broadly worded mutual release of debts that plaintiff and borrower agreed to when they settled the Foreclosure Lawsuit.

Where the prior motions for summary judgment had failed, this one succeeded: the trial court accepted defendants' argument that the mutual release plaintiff agreed to extinguished his insurable interest in the Property and, with it, his right to recover compensation under the insurance policy.  In its written ruling, the trial court acknowledged the question of whether plaintiff made a "full credit bid"[3] for the Property at the foreclosure auction was a material disputed fact, and the court did not refer to, or rest its decision on, the nature of the claims between plaintiff and borrower in the Foreclosure Lawsuit.  Rather, the court pointed solely to what it saw as "unambiguous and express terms" in the release and decided that "the debt remaining after the non-

---

[3]    A full credit bid is a credit bid at a foreclosure sale in an amount equivalent to the full amount of the debt that a borrower owes on the loan for which the property served as collateral, plus foreclosure expenses.  (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239 (*Alliance Mortgage*).)

5

judicial foreclosure, if any, was expressly extinguished by the release and the debtor-creditor relationship between [borrower] and [plaintiff] was terminated." Thus, the court concluded, when plaintiff settled the Foreclosure Lawsuit by paying borrower $15,000 and releasing borrower from any and all debts that he had against plaintiff, plaintiff thereby gave up his right to make a claim under the insurance policy "as a matter of law." The trial court entered judgment in favor of Lloyds and Gorst, and plaintiff timely noticed this appeal.

## DISCUSSION

To resolve the central issue before us, whether plaintiff surrendered his right to collect insurance proceeds for damage to the Property, we must address intersecting principles of California insurance law; property law, as it relates to mortgages; and contract law. Specifically, we consider what interest one must have to insure property, the consequences a foreclosure sale has on the obligations of a defaulting borrower, and how explicit a contract must be for a third party to invoke its provisions in support of a claim that one of the contracting parties extinguished a vested right. It is the last of these three questions that proves most consequential in resolving plaintiff's contentions of error, and we conclude there remains a disputed issue of fact as to whether the release plaintiff executed was intended to extinguish his right to make an insurance claim under the policy defendants issued. We therefore reverse the grant of summary judgment.

### A. *Summary Judgment Standard of Review*

Summary judgment is appropriate only where the moving party establishes there exists no triable issue of material fact and that he or she is entitled to judgment as a matter of law. (*Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 850.) We review a trial court's decision on summary judgment de novo, "considering all of the evidence the parties offered in connection with the motion (except that which the [trial] court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476; *Hyundai Securities Co., Ltd. v. Lee*

6

(2015) 232 Cal.App.4th 1379, 1385.)  We "must resolve all doubts in favor of the party opposing the judgment."  (*Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 131; accord *Kulesa v. Castleberry* (1996) 47 Cal.App.4th 103, 112.)

### B.    *The Insurable Interest Doctrine*

The insurable interest doctrine dates back to 18th century England.[4]  The purpose of the doctrine was to discourage a "mischievous kind of gaming" on human life or property, whereby enterprising individuals would purchase insurance on the lives of others reported to be seriously ill or on property they did not own.  The amount "wagered" was the policy premium, and the gamble was how soon death or disaster would befall the person or property insured.  This sort of gambling was understandably believed to create an incentive for wrongdoing by the "gambler."  (1 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition (2015) § 1.05[3], pp. 52-54; 7 Williston on Contracts (4th ed. 1997) § 17.5, pp. 567, 576-577.)

California law has long required an insurable interest for an insurance contract to be valid.  (Ins. Code, § 280; *Davis v. Phoenix Ins. Co.* (1896) 111 Cal. 409.)  An insurable interest exists when "the insured has a direct pecuniary interest in the preservation of the property and . . . will suffer a pecuniary loss as an immediate and proximate result of its destruction."  (*Davis v. Phoenix Co.*, *supra*, at p. 414; accord, Ins. Code, § 281.)  A loan that is secured by real property creates an interest in the property that serves as the collateral.  (See *Mosee v. Firemen's Ins. Co. of Newark* (1927) 87 Cal.App. 473, 475 ["[T]he interest created by a mortgage or deed of trust in the nature of a mortgage is an insurable interest distinct from that of the mortgagor or grantor"].)  The lender's "interest in the property is the repayment of the debt."  (*Track Mortg. Group Inc.*

---

[4]    The Life Assurance Act [of] 1774 provided "[N]o insurance shall be made . . . on the life or lives of any person, or persons, or any other event or events whatsoever, wherein the person or persons for whose use, benefit, or on whose account such policy or policies shall be made, shall have no interest. . . . "  (14 Geo. 3, c. 48, § 1 (Eng.).)

*v. Crusader Ins. Co.* (2002) 98 Cal.App.4th 857, 864, citing *Alliance Mortgage*, *supra*, 10 Cal.4th at pp. 1238-1239.)

California law also defines *when* an interest in the property or asset insured must exist, namely "when the insurance takes effect, and when the loss occurs"; the insurable interest need not exist in the meantime. (Ins. Code, § 286; *Liberty Mut. Fire Ins. Co. v. McKenzie* (2001) 88 Cal.App.4th 681, 689.) Here, it is undisputed that plaintiff held an interest in the Property when the insurance policy in question issued in April 2010. For purposes of resolving this appeal, and for reasons we explain in the next part of this opinion, we also take it as true that plaintiff held an insurable interest when he discovered the loss in May 2010. Thus, unless a subsequent action extinguished his insurable interest as a matter of law, plaintiff is entitled to an opportunity to prove at trial that he has a right to compensation under the policy. (Cf. Ins. Code, § 301 ["A change of interest in a subject insured, after the occurrence of an injury which results in a loss, does not affect the right of the insured to indemnity for the loss"].)

C.      *California's Non-Judicial Foreclosure Laws, and the Right to Recover Insurance Proceeds on a Legally Fictitious Debt*

"California has an elaborate and interrelated set of foreclosure and antideficiency statutes relating to the enforcement of obligations secured by interests in real property." (*Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1236.) "Pursuant to this statutory scheme, there is only 'one form of action' for the recovery of any debt or the enforcement of any right secured by a mortgage or deed of trust. That action is foreclosure, which may be either judicial or nonjudicial." (*Ibid.*; Code Civ. Proc., §§ 725a, 726, subd. (a).)

When a lender proceeds by way of judicial foreclosure proceedings, the lender may seek from the court a deficiency judgment—the difference between the amount of the borrower's outstanding debt and the fair market value of the property, as determined by a court—if the property sells for less than the amount of the indebtedness. (*Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1236; *Roseleaf Corp. v. Chierighino* (1963) 59 Cal.2d 35, 43-44.) Non-judicial foreclosure proceedings, on the other hand, are quicker and less

8

expensive, but they do not allow a lender to seek a deficiency judgment. (*Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1236.) Rather, the statutory scheme enacted by the Legislature protects a borrower from personal liability for the debt owed following a non-judicial foreclosure sale.[5] (Code Civ. Proc., § 580d; *Cornelison v. Kornbluth* (1975) 15 Cal.3d 590, 602; *Smith v. Allen* (1968) 68 Cal.2d 93, 96 [properly conducted foreclosure sale constitutes a final adjudication of lender and borrower rights]; *CADC/RAD Venture 2011-1 LLC v. Bradley* (2015) 235 Cal.App.4th 775, 783-784 [anti-deficiency statutes prohibit lenders from obtaining judgments against borrowers where the foreclosure sale proceeds are insufficient to cover the amount of the debt]; *Commonwealth Mortgage Assurance Co. v. Superior Court* (1989) 211 Cal.App.3d 508, 516 ["'No liability, direct or indirect, should be imposed upon the debtor following a nonjudicial sale of the security'"].)

Although a non-judicial foreclosure, in effect, eliminates a borrower's debt by preventing a lender from pursuing a judgment against the borrower, courts have treated the borrower's debt as if it continues to exist in order to protect the lender's right to obtain insurance proceeds for a loss that occurs prior to a foreclosure sale. (*Armsey v. Channel Associates, Inc.* (1986) 184 Cal.App.3d 833, 837 (*Armsey*) ["The debtor-creditor relationship between the parties is not totally extinguished during foreclosure proceedings where the beneficiary purchases property for less than the amount of the balance due under the deed of trust"]; *Redlinger v. Imperial Savings & Loan Assn.* (1975) 47 Cal.App.3d 48, 50 (*Redlinger*) [same]; see also *Birman v. Loeb* (1998) 64 Cal.App.4th 502, 518 ["Defendants correctly assert the nonjudicial foreclosure, at which they

---

5       Prior cases have held that lenders cannot contract around the preclusive effect of the statutory scheme, often referred to as the "anti-deficiency statutes." "Because the antideficiency legislation was established for a public purpose '[t]he debtor cannot be compelled to waive the antideficiency protections in advance . . . and [the protections] cannot be contravened by a private agreement.' (*Cadle* [*Co. II v. Harvey* (2000)] 83 Cal.App.4th [927,] 932, citations omitted[].)" (*California Bank & Trust v. Lawlor* (2013) 222 Cal.App.4th 625, 632.) Further, "the proscriptions of [the anti-deficiency statutes] cannot be avoided through artifice." (*Passanisi v. Merit-McBride Realtors Inc.* (1987) 190 Cal.App.3d 1496, 1508.)

reacquired the property for less than the full amount of the outstanding indebtedness, did not extinguish the debt"]; *Rosenbaum v. Funcannon* (9th Cir. 1962) 308 F.2d 680, 684 ["If the security property does not bring enough to pay the debt, the debt itself remains to the extent that it is unpaid, notwithstanding extinguishment of the mortgage as such . . . at foreclosure sale"].) By employing this legal fiction, that the borrower's debt continues to exist notwithstanding California's anti-deficiency statutes, courts allow lenders to collect insurance proceeds to compensate for the loss in value of their collateral without undermining the insurable interest doctrine.

Courts, however, have routinely declined to employ this legal fiction to protect a lender's right to recover insurance proceeds in one circumstance: where the lender makes a full credit bid for the property serving as security for the loan. Where such a bid is made at a public auction, the law treats the amount bid as a concession by the purchaser that the property is worth (at least) that amount. (*Alliance Mortgage*, *supra*, 10 Cal.4th at p. 1238; *Cornelison v. Kornbluth*, *supra*, 15 Cal.3d at pp. 606-607.) Because the lender has purchased property conceded to be worth the entire amount of the outstanding debt, courts hold the lender is not entitled to insurance proceeds payable for damage to the property because the lender's security interest (the balance due on the loan) has been satisfied and any other payment would give the lender a double recovery. (*Track Mortg. Group Inc. v. Crusader Ins. Co.*, *supra*, 98 Cal.App.4th at p. 864; *Rosenbaum v. Funcannon*, *supra*, 308 F.2d at p. 684; see also *Reynolds v. London & Lancashire Fire Ins. Co.* (1900) 128 Cal. 16, 19-20.)

The trial court in this case did not find that plaintiff's insurable interest in the Property was extinguished because he made a full credit bid; to the contrary, the court granted summary judgment notwithstanding its view that the question of whether plaintiff made a credit bid in the full amount of borrower's indebtedness was a disputed issue of material fact. And while it is true, at least in theory, that some post-foreclosure compensation other than from insurance proceeds could vitiate a lender's security interest, there has been no showing by undisputed facts of such repayment to plaintiff here.

10

Defendants suggest plaintiff was made whole, i.e., he actually recovered the full amount of his security interest, by settling the Foreclosure Lawsuit. But all we know for certain from the record about that lawsuit and the agreement to settle it is that plaintiff paid borrower $15,000 as consideration. Defendants speculate that plaintiff would have had to pay more than $15,000 to settle the lawsuit if he had "chosen not to settle the mortgage debt," and they assert plaintiff "chose to use the debt as a bargaining chip." California's anti-deficiency laws, however, prohibited plaintiff from proceeding against borrower to recover on that debt after the foreclosure sale. Because release of the mortgage debt therefore had no value to borrower, it could have had no value to plaintiff in settling borrower's lawsuit. Instead, based on the evidence before the trial court at summary judgment, defendants would have us hold plaintiff paid $15,000 to give up his own right to collect insurance proceeds for the damage to the property. That makes neither logical nor financial sense—certainly not for plaintiff, and not for borrower either. Borrower would derive no benefit from any waiver by plaintiff of his right to collect insurance proceeds because borrower had no claim to the proceeds; he denied ever requesting the insurance policy.

Defendants imply, with scant support in the record before us, that plaintiff had viable non-contractual cross-claims against borrower seeking compensation for property damage, and that plaintiff's decision to forbear pursuing those claims could have reduced the amount plaintiff would have otherwise had to pay borrower as consideration for borrower to agree to dismiss his claims and settle the case. (See *Cornelison v. Kornbluth*, *supra*, 15 Cal.3d at pp. 603-604 [Code Civ. Proc. § 580b bars actions for waste but not "bath faith waste"].) If that were true, one could argue this assumed savings should be credited as partial or complete repayment of borrower's loan debt. But that is a question of fact that was not considered by the trial court in granting summary judgment, and one that cannot be considered by this court on appeal, particularly with the paucity of information in the record about the Foreclosure Lawsuit.

Rather, both the trial court and defendants relied solely on the release that plaintiff and borrower executed when settling the Foreclosure Lawsuit. Defendants argued, and

11

the trial court agreed, that the "unambiguous and express terms of the broad waiver released the mortgage debt," and thus, plaintiff's right to collect on the insurance policy defendants issued. We therefore turn to the release and analyze whether it does unambiguously so provide.

D. *The Release Does Not Extinguish Plaintiff's Insurable Interest as a Matter of Law*

"Release agreements are governed by the generally applicable law of contracts." (*Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 348 (*Neverkovec*).) On appellate review, a trial court's interpretation of contract provisions, including a determination of whether the terms are ambiguous, is a question of law that we review de novo. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554-555; see also *Christensen v. Smith* (2009) 171 Cal.App.4th 931, 937 ["Whether the terms of a contract are ambiguous is a question of law"]; *Arntz Builders v. City of Berkeley* (2008) 166 Cal.App.4th 276, 284 [interpretation of contract provisions is a legal issue subject to de novo review unless the contract is ambiguous and its interpretation turns on the resolution of factual disputes].)

"However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." (Civil Code, § 1648.) "'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.)' (*Bank of the West v. Superior Court* [1992] 2 Cal.4th [1254,] 1264.) 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' (*AIU Ins. Co. v. Superior Court* [1990] 51 Cal.3d [807,] 822.) 'If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)'" (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37.) But where contract terms are ambiguous, courts consider extrinsic evidence in determining the intention of the parties. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126; *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 37 [if extrinsic evidence demonstrates

ostensibly clear language in contract is susceptible to more than one reasonable interpretation, extrinsic evidence may be used to determine intent].)

Defendants were not a party to the Foreclosure Lawsuit settlement agreement, but they invoke its release provision—in particular, its reference to "debts"—in support of their position that plaintiff surrendered his right to collect insurance proceeds. By its own terms, the release applies only to plaintiff and borrower; it makes no reference to agents or brokers of either, and it certainly makes no reference to defendants. "[A] nonparty who claims benefits under [a] contract is entitled to do so long as the claimed benefit does not flow to him as a mere incident of the agreement, but is one the contracting parties intended to confer. [Citations.] [¶] The rights of a third party beneficiary thus depend upon the intent of the contracting parties. (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [].)" (*Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, 1028; see also *Neverkovec*, *supra*, 74 Cal.App.4th at p. 349 ["[T]o obtain summary judgment on the ground that a general release has discharged him from liability, a third party to the release agreement must affirmatively show that the parties intended to release him. The burden of proof is on the third party, under both contract law and the summary judgment statute"].)

The mutual release agreed to by plaintiff and borrower, while admittedly broad, is ambiguous as to the meaning of the term "debts." (See *Neverkovec*, *supra*, 74 Cal.App.4th at pp. 341, 353 [triable issue of fact as to whether release applied to the defendant despite language "that appears to excuse everyone in the world from liability"].) As we have explained, when plaintiff and borrower executed the agreement to settle the Foreclosure Lawsuit over a year after plaintiff purchased the Property at auction, no actual debt existed between them. Under California's anti-deficiency statutes, the foreclosure sale extinguished plaintiff's ability to pursue a judgment against borrower for any part of his unpaid loan balance that was not covered by plaintiff's credit bid.

To be sure, a "debt" between the two persisted as a legal fiction to protect plaintiff's ability to collect insurance proceeds for the loss he suffered, but there are insufficient indicia on the face of the settlement agreement that the parties to that

13

agreement intended to extinguish a debt that existed as a mere legal fiction. On the one hand, we have no reliable basis on the record before us to conclude that plaintiff intended to extinguish his right to collect insurance proceeds from defendants when signing the agreement. And on the other hand, there is no reason to believe borrower would have wanted or bargained for a release from this legally fictitious debt—he was effectively released from his mortgage debt long before by operation of California's anti-deficiency statutes.

The sole function of the fictitious debt that remained was to protect plaintiff's right to collect insurance proceeds from an insurer that was not a party to the Foreclosure Lawsuit settlement agreement. To avoid ambiguity under these uncommon circumstances, and as a matter of law, the agreement would have had to have been more specific about the nature of the interest being released—even a fairly perfunctory reference to insurance (which was of course absent) would have done the job. (See *Appleton v. Waessil*, *supra*, 27 Cal.App.4th at pp. 555-556 [reasoning if parties had intended to release third party they would have named him specifically in the release].)

The only extrinsic evidence as to the meaning of the release that was before the trial court on summary judgment was from plaintiff.[6] In his declaration, he averred that he did not intend, in executing the Foreclosure Lawsuit settlement agreement, to release any claims he had against defendants in this action. Courts have appropriately held such declarations of subjective intent are not dispositive. (See, e.g., *Neverkovec*, *supra*, 74 Cal.App.4th at p. 351; *Rodriguez v. Oto, supra*, 212 Cal.App.4th at pp. 1034-1035.) But defendants introduced no extrinsic evidence at all, and given the ambiguity we find in the release under the circumstances, defendants did not carry their burden to demonstrate as a matter of law that plaintiff intended to surrender his insurable interest by executing the Foreclosure Lawsuit settlement agreement. The parties intentions in executing that

---

[6] Where an agreement is ambiguous as to the intended sweep of a release clause, the presence of an integration clause in the agreement does not preclude consultation of extrinsic evidence to determine the intent of the parties to the agreement. (*Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) 237 Cal.App.4th 1342, 1354-1355.)

agreement, and the question of whether plaintiff retains an insurable interest, will have to be settled at trial.

Because we hold plaintiff's insurable interest was not forfeited as a matter of law and reverse the grant of summary judgment, we need not address his other contentions of error.

DISPOSITION

The judgment is reversed. Appellant is to recover his costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:


KRIEGLER, Acting P.J.


KUMAR, J.[*]


---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15